## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KRISTY BABIK, | ) ELECTRONICALLY FILED |
| *Plaintiff*, | ) Case No. 2:23-CV-2060 |
| vs. | ) |
| CREEKSIDE SPRINGS LLC, | ) |
| *Defendant*. | ) JURY TRIAL DEMANDED |

### COMPLAINT IN CIVIL ACTION

Plaintiff, Kristy Babik (hereinafter, "Plaintiff"), by and through the undersigned counsel, now files the within Complaint in Civil Action against Defendant, Creekside Springs LLC (hereinafter, "Defendant"), and avers as follows:

### PARTIES

1. Plaintiff is an adult individual who resides at 299 Linmar Terrace, Aliquippa, Pennsylvania 15001.

2. Furthermore, Plaintiff is a biological female who identifies as Caucasian, and at all times pertinent herein, was approximately thirty-two (32) years old.

3. Defendant is a limited liability company formed under the laws of Pennsylvania with its principal place of business located at 302 Merchant Street, Ambridge, Pennsylvania 15003. At that address, and at all times relevant hereto, CSL owned and operated a facility that packages bottled water for consumption by the public (hereinafter, the "Facility").

4. Moreover, Defendant is a privately owned, vertically integrated manufacturer of private label purified, distilled, spring and enhanced waters.

**JURISDICTION AND VENUE**

**A.  This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331 and Supplemental Jurisdiction Pursuant to 28 U.S.C. § 1367.**

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (hereinafter, "Title VII") (collectively, Plaintiff's claims arising under Title VII are identified as the "Federal Law Claims").

2.  Plaintiff is also advancing claims under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* (hereinafter, the "PHRA") (the "State Law Claims").  This Court may exercise supplemental jurisdiction over the State Law Claims pursuant to 28 U.S.C. § 1367(a) as the Federal Law Claims and the State Law Claims share operative facts that support the corresponding causes of action within the Federal Law Claims and the State Law Claims.  Further, the operative facts between the Federal Law Claims and the State Law Claims mirror one another to such a degree that they form the "same case or controversy" under Article III § 2 of the United State Constitution which further supports this Court's exercise of supplemental jurisdiction over the State Law Claims.

**B.  The United States District Court for the Western District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

3.  Venue is proper in the United States District Court for the Western District of Pennsylvania, Pittsburgh Division (the "Western District") as a substantial part of the events and omissions giving rise to the Federal Law Claims and State Law Claims occurred within this judicial district.  Specifically, these events and omissions occurred within Beaver County, Pennsylvania which is one of the counties encompassed by the Western District.  This matter is properly before the Pittsburgh Division of the Western District given the conduct complained of herein arose in

Beaver County, Pennsylvania and conduct arising within Beaver County is docketed within the Pittsburgh Division of the Western District pursuant to LCvR 3.

**C.     This Court May Exercise Personal Jurisdiction Over Defendant through Pennsylvania's Long-Arm Statute and This Exercise of Personal Jurisdiction Comports with the Traditional Notions of Fair Play and Substantial Justice.**

4.     This Court may exercise personal jurisdiction over Defendant as Defendant has the required minimum contacts with this forum for purposes of Pennsylvania's Long-Arm statute codified within 42 Pa. C.S. § 5322.  Further, the exercise of jurisdiction over Defendant by and through Pennsylvania's Long-Arm Statute complies with the traditional notions of fair play and substantial justice required by the Due Process Clause of the Constitution given the "specific jurisdiction" that exists over Defendant.

5.     At the outset, Pennsylvania's Long-Arm statute provides that a tribunal may exercise personal jurisdiction where an individual or entity is "transacting any business in this Commonwealth".  42 Pa.C.S. § 5322.

6.     The following enumerated subsections within 42 Pa. C.S. § 5322(a) define "transacting any business" to include:

> (1)(i) The doing by any person in this Commonwealth of a series of similar acts for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an act.
> (1)(ii) The doing of a single act in this Commonwealth for the purpose of thereby realizing pecuniary benefit or otherwise accomplishing an object with the intention of initiating a series of such acts.
> (1)(iv) The engaging in any business or profession within this Commonwealth, whether or not such business requires license or approval by any government unit of this Commonwealth.
> (1)(v) The ownership, use or possession of any real property situate within this Commonwealth.
> (3) Causing harm or tortious injury by an act or omission in this Commonwealth
> (5) "having an interest in, using, or possessing real property in this Commonwealth

> (10) committing any violation within the jurisdiction of this Commonwealth of any statue, home rule charter, local ordinance or resolution, or rule or regulation promulgated thereunder by any government unit or of any order of court or other government unit."

*Id.*

7. In the instant matter, personal jurisdiction can be found over Defendant under Pennsylvania's Long-Arm Statute for the following reasons:

   a. Defendant maintains an office located in Ambridge, Pennsylvania, routinely engages in various commercial activities within the Commonwealth of Pennsylvania for the purpose of pecuniary gain; and

   b. As averred more fully below, Defendant violated numerous statutory provisions of federal and state law and the underlying events giving rise to Defendant's unlawful conduct, including the harm that Plaintiff sustained therefrom, occurred in Pennsylvania.

8. This Court's exercise of personal jurisdiction over Defendant by and through Pennsylvania's Long-Arm Statute comports with the Due Process Clause of the Constitution through the "specific jurisdiction" that exists over Defendant as the causes of action complained of herein arise specifically from Defendant's contact with the forum. U.S. Const. amend XIV, § 1

9. The inquiry into whether "specific jurisdiction" exists possesses three parts. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). First, a "defendant 'must have purposefully directed [its] activities' at the forum". *Id.* quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Second, the instant litigation must "arise out of or relate to at least one of those activities". *Id.* quoting *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414 (1984). And third, whether the exercise of jurisdiction "'comport[s] with fair play and substantial justice'". *Id.* quoting *Burger King*, 471 U.S. at 476.

4

10. Defendant has engaged in business operations for pecuniary gain within the forum and these business operations were, at all times relevant hereto, intentionally effectuated by the Defendant. As more thoroughly delineated below, Plaintiff participated in these business operations, through an employment relationship, and correspondingly the Federal Law Claims and the State Law Claims arise from said relationship. Further, the Federal Law Claims and the State Law Claims arose because of these business operations and from the unlawful activity Defendant engaged in occurred within the scope of these operations.

11. The exercise of personal jurisdiction exists over Defendant and complies with the notions of "fair play and substantial justice" required by *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Given the operative facts occurred within this forum, the evidence and witnesses supporting both the Federal Law Claims and the State Law Claims are located primarily here. As such, this forum offers both Plaintiff and Defendant the most convenient and effective relief opposed to other forums and ensures each party may fairly access the evidence to support its claims and/or defenses.

12. Therefore, personal jurisdiction over Defendant is proper in light of Defendant's consent to personal jurisdiction and Pennsylvania's Long-Arm Statute and Defendant may properly be pursued before this Court.

**D.  Plaintiff has exhausted its administrative remedies and the Federal Law Claims and the State Law Claims are now properly able to be brought before this Court.**

13. Plaintiff has satisfied all procedural and administrative prerequisites under 29 U.S.C. § 626, 42 U.S.C. § 2000e-5, and 43 P.S. § 959 and now may proceed to bring this action before the Court. Specifically:

    a. On April 20, 2023, Plaintiff dual filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") seeking redress for the

       Federal Law Claims and the State Law Claims at charge number 533-2023-01623 (the "<u>EEOC Charge</u>") and with the Pennsylvania Human Relations Commission (the "<u>PHRC</u>").

    b. On October 2, 2023, the EEOC issued the Determination and Notice of Rights (the "<u>DNR</u>"), wherein Plaintiff was afforded ninety days within which to timely file the Federal Law Claims and the State Law Claims. A true and correct copy of the DNR is attached hereto, made a part hereof, and identified as **Exhibit A**. The instant Complaint is filed within the ninety-day time period.

## GENERAL ALLEGATIONS

14. On or about June 26, 2022, Plaintiff commenced her employment with Defendant, working the 4:30 p.m. to 12:30 a.m. shift and correspondingly earning $13.00 per hour.

15. On the above-mentioned date, Plaintiff's immediate supervisor, John (last name unknown) (hereinafter, "<u>Mr. John</u>") assigned Plaintiff to operate a machine called the "META," (hereinafter, the "<u>META Machine</u>") which is located on the second floor of the Facility.

16. As part of her two-week training program, Mr. John required Plaintiff to work on the first floor of the Facility and in close physical proximity to Dorian Byrd (hereinafter, "<u>Mr. Byrd</u>"), who is an African American biological male and approximately forty (40) years old.

17. During the training period, Mr. Byrd became immediately outwardly infatuated with Plaintiff and began making offensive and unwanted comments of a sexual nature to Plaintiff.

18. At all times relevant hereto, Mr. Byrd's comments directed to Plaintiff were sexually offensive and were unwanted by Plaintiff.

19. Mr. Byrd's comments were numerous in nature and concerned a variety of topics relative to Plaintiff's physique. Specifically, Mr. Byrd's comments included variations of his

intention and sexual desire to "touch", "rub", "squeeze", and "photograph" Plaintiff's body and specifically her buttocks. Mr. Byrd further made offensive and unwanted comments directed towards Plaintiff which included comments about Plaintiff, such as "cute butt" and "tight ass".

20. Plaintiff rebuked the above comments of Mr. Byrd and, in no uncertain terms, conveyed her demand that he stop making sexual advances toward her. However, Mr. Byrd dismissed Plaintiff's complaints and refused to stop sexually harassing Plaintiff.

21. When the training period noted above ended, Mr. Byrd directed Plaintiff to work the META Machine located on the second floor of the Facility.

22. On or about October of 2022, Mr. John promoted Plaintiff and, as such, she was then transferred to utilize a machine identified as the "Filler," (hereinafter, the "Filler Machine") which is located on the first floor of the Facility.

23. Immediately thereafter, Mr. Byrd once again began making comments concerning Plaintiff's buttocks, reiterating his statements above, and physically gesturing as if he was attempting to grab or squeeze Plaintiff's buttocks.

24. Mr. Byrd also followed Plaintiff from behind and made lewd gestures and physical movements with his body as though he was simulating sexual intercourse with Plaintiff. This naturally mortified and humiliated Plaintiff.

25. On or about November of 2022, Mr. John became ill and was absent from work. During his departure, Mr. John appointed Mr. Byrd to act as Plaintiff's immediate supervisor.

26. Mr. Byrd, wielding this newfound power and authority over Plaintiff, then escalated the sexual harassment that he displayed toward Plaintiff. For instance, Mr. Byrd regularly invaded Plaintiff's personal space, maneuvered himself into a position where he could physically brush his

7

body up against Plaintiff's, and thereinafter physically sexually assaulted by rubbing himself up against her.

27. Further, Mr. Byrd upscaled the crude and illicit nature of his verbal sexual abuse of Plaintiff, saying, among other things, that he wanted to "wipe" and "lick" her buttocks when she went to the restroom.

28. Once again, Plaintiff protested the sexually hostile work environment Mr. Byrd was perpetuating to Plaintiff, however, Mr. Byrd once again refused to stop his unwanted, offensive, and discriminatory conduct.

29. The above instances of sexual harassment persisted and continued into the third week of December 2022.

30. On or about December 19, 2022, Plaintiff entered an office that was open to all employees of Defendant's employees and was an area where the employees frequented and performed certain job duties. Upon entry, Plaintiff observed Mr. Byrd masturbating in a chair at a desk.

31. Appalled, Plaintiff naturally reacted with a verbal sigh of shock and disgust and then left the office area.

32. Immediately thereafter, Mr. Byrd pursued Plaintiff in a futile attempt to obtain her attention. When Plaintiff ignored him, Mr. Byrd verbally called out to Plaintiff with "hey," "what is going on," and "what are you doing." In response, in a state of shock, Plaintiff remained quiet.

33. At this point, Mr. Byrd became increasingly angry and, in an authoritative command, stated to Plaintiff: "*You will talk to me when I talk to you, and you will do what I tell you because I'm your supervisor, b\*\*\*h!*" Plaintiff refused to engage with Mr. Byrd and continued walking away in an attempt to avoid any further interaction with Mr. Byrd.

34. Plaintiff, once removed from Mr. Byrd's vicinity, then attempted to contact Mr. John to report the sexually hostile work environment Mr. Byrd perpetuated and to report the abovementioned incident she witnessed Mr. Byrd engaging in.

35. Approximately one hour later, and unable to contact Mr. John, Plaintiff sent a text message to Ted (last name unknown) (hereinafter, "Mr. Ted") who was a high-ranking manager and who possessed supervisor authority over the entire Facility, including Mr. John and Mr. Byrd.

36. In that text message, Plaintiff reported the overt and shocking sexual harassment that Mr. Byrd had perpetrated against her, demanded that the sexual harassment stop immediately, and requested that she no longer work within the vicinity of Mr. Byrd.

37. In turn, Mr. Ted informed Plaintiff that he would not be in the Facility until December 21, 2022, and instructed her to return to the second floor of the Facility to operate the META Machine.

38. On December 20, 2022, Plaintiff worked the META Machine per Mr. Ted's instruction. In doing so, Plaintiff was not exposed to any of Mr. Byrd's sexually aggressive comments or gestures; nor was she subjected to any of his physical assaults.

39. On December 21, 2022, Plaintiff arrived at the Facility and sought the assistance of Mr. Ted to further report Mr. Byrd's conduct and initiate an investigation into the matter. However, Mr. Ted was not available. As such, Plaintiff worked the META Machine on the second floor of the Facility in adherence to Mr. Ted's precise instruction.

40. On December 22, 2022, Plaintiff arrived at the Facility and again sought the assistance of Mr. Ted. However, once again, Mr. Ted was not available. Consequently, and in adherence to Mr. Ted's previous instruction, Plaintiff continued to work on the META Machine.

41. Approximately two hours into Plaintiff's shift, Mr. Byrd ascended from the first floor of the Facility to the second floor and approached Plaintiff in a direct and authoritative fashion. At this point, Mr. Byrd commanded Plaintiff to work alongside him on the first floor wherein she would once again be subjected to his sexually aggressive and unwanted behaviors delineated above. Plaintiff correspondingly stated she was acting in accordance with Mr. Ted's instruction. Mr. Byrd then stated: "*do as you are told. I am your supervisor.*"

42. Plaintiff then removed herself to the women's restroom wherein she sent a text message to Mr. Ted in an attempt to have Mr. Ted shield her from any further instances of sexual harassment from Mr. Byrd. However, Mr. Ted refused to respond.

43. Thereafter, Plaintiff exited the restroom and, in an effort to avoid further subjection to a sexually hostile environment and per Mr. Ted's instruction, returned to work at the META Machine.

44. A few minutes later, Mr. Byrd again ascended from the first floor, approached Plaintiff, and commanded her to work beside him on the first floor. Plaintiff indicated she was following Mr. Ted's instruction and indicated she would work the META Machine. Furious over the matter, Mr. Byrd instructed Plaintiff: "*Do it, b***h, or you are fired!*"

45. At that moment, Plaintiff verbally reiterated that she would not work alongside Mr. Byrd. In response, Mr. Byrd informed Plaintiff that she was discharged and directed that she depart the premises of the Facility immediately.

46. On December 23, 2022, Plaintiff sent a text message to Mr. Ted, inquiring about her employment status. However, Plaintiff did not receive a response.

47. Thereafter, the Facility was closed over the weekend and the following Monday. On December 27, 2022, Plaintiff visited Mr. Ted in person at the Facility and asked whether she was still employed with Defendant.

48. In response, Mr. Ted informed Plaintiff that she was terminated, effective December 22, 2022, for failure to obey the directives of Mr. Byrd.

### COUNT I
### INTENTIONAL DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF TITLE VII AND/OR THE PHRA
### 42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.*

49. Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

50. Plaintiff experienced discrimination based upon her gender from the commencement of her employment through the time of her termination, as set forth above.

51. Ultimately, as a result of the gender discrimination, Defendant terminated Plaintiff's employment.

52. "In order to establish a *prima facie* case of gender discrimination, an employee must show that: (1) they are a member of a protected group; (2) they are qualified for the position at issue; (3) they were discharged or suffered some adverse employment action by the employer; and (4) they were treated less favorably than other similarly situated employees outside the protected group." *In re Tribune Media Co.*, 902 F.3d 384, 402 (3d Cir. 2018) (internal citations and alterations omitted).

**A.   Plaintiff is a Member of a Protected Group and Was Qualified For the Position At Issue.**

53. At all times relevant hereto, Martin was a member of a protected group insofar as Martin is a biological female.

11

**B.      Plaintiff was Qualified for the Position.**

54.     Plaintiff was qualified to perform the tasks and job duties of her position, as evidenced by her experience, education, and hiring by Defendant.

55.     Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of her position.

56.     Specifically, Plaintiff was sufficiently skilled in the areas of comprehension, communication, interpretation, and analysis needed to operate the machinery within the Facility.

57.     Further, Plaintiff was able to comply with the physical demands of the position given the background Plaintiff possessed in laborer-style roles.

**C.      Plaintiff Suffered Adverse Employment Actions and Was Treated Less Favorably than Similar Employees Outside His Protected Class.**

58.     The actions set forth above, including but not limited to Plaintiff's termination, were actions not suffered by her similarly situated male coworkers.

59.     As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Kristy Babik, seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT II
## HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF TITLE VII AND/OR THE PHRA
## 42 U.S.C. § 2000e, *et seq.* and 43 P.S. § 951, *et seq.*

60.     Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

61. To establish a Title VII hostile work environment claim against an employer, a Martin employee must prove: (1) the employee suffered intentional discrimination, among other ways, because of their race or gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (internal citations omitted); *see also, Sarullo v. US Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

**A.   Plaintiff Suffered Intentional Discrimination Because of Her Gender.**

62. As set forth above, Defendant, through various employees, managers, and supervisors, intentionally discriminated against Plaintiff on the basis of her gender.

63. The forms of gender discrimination described above were so egregious and profoundly shocking that they, in and of themselves and apart from one another, constituted intentional gender discrimination that was shockingly and extremely severe and pervasive for purposes of Title VII and the PHRA. Specifically, the offensive, unwanted comments and conduct of a sexual nature, and discriminatory treatment toward Plaintiff, including but not limited to (i) Mr. Byrd's speaking of his intention and sexual desire to "touch", "rub", "squeeze", and "photograph" Plaintiff's body and specifically buttocks; and (ii) Mr. Byrd's making of lewd gestures and sexual assault are examples of gender discrimination in its most prominent form.

**B.   The Discrimination Was Sufficiently Severe and Pervasive that it Detrimentally Impacted Plaintiff and Would Have Negatively Impacted a Reasonable Person in Similar Situations.**

64. The forms of discrimination occurred frequently and went uncorrected by Defendant, although Defendant was explicitly advised of the same.

65. Plaintiff considered the intentional gender discrimination delineated above to be unwelcome and at no time did Plaintiff ever suggest or imply that it was acceptable behavior, in fact she explicitly made it clear to Defendant that same were offensive and unwelcome.

66. Any reasonable person in the situation of Plaintiff would have been detrimentally affected if the comments or actions of Plaintiff's coworkers and managers were directed at any other female individual.

**C.   *Respondeat Superior* Liability Exists Given Defendant's Role and Refusal to Remediate the Hostile Work Environment.**

67. The Third Circuit has held that an employer is vicariously liable "for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Hitchens v. Montgomery Cnty.*, 278 F. App'x 233, 236 (3d Cir. 2008) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

68. Further, a plaintiff "may demonstrate *respondeat superior* liability by providing evidence that their supervisor subjected them to a 'tangible employment action,' such as discharge, demotion, or undesirable reassignment." *Id*.

69. Given the central role that Plaintiff's managers, Mr. John, Mr. Byrd and Mr. Ted played in Plaintiff's termination, Plaintiff can readily establish the existence of *respondeat superior* liability.

70. As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Kristy Babik, seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

**COUNT III**
**UNLAWFUL RETALIATION ON THE BASIS OF PROTECTED ACTIVITY**
**IN VIOLATION OF TITLE VII AND/OR THE PHRA**
**42 U.S.C. § 2000e,** *et seq.* **and 43 P.S. § 951,** *et seq.*

71. Plaintiff incorporates the above paragraphs, as if fully set forth at length herein.

72. It is well established that Title VII makes it illegal for an employer to discriminate against an employee because the employee opposed a practice made unlawful by Title VII. *See* 42 U.S.C. § 2000e-3(a).

73. To establish a claim for retaliation on the basis of gender, Plaintiff must show, "(1) [that he engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (quoting *Fogleman v. Mercy Hosp. Inc*., 283 F.3d 561, 567–68 (3d Cir. 2002)).

**A.    Plaintiff Engaged in "Protected Activities" Upon Reporting Gender Discrimination.**

74. On numerous occasions during Plaintiff's tenure of employment with Defendant, Plaintiff complained to Mr. John and Mr. Ted, reporting the sexual harassment and gender discrimination delineated above.

75. It is axiomatic that "informal protests of discriminatory employment practices, including making complaints to management" constitute "protected activity" for purposes of a retaliation claim pursuant to Title VII. *Swanger-Metcalfe v. Bowhead Integrated Support Servs., LLC*, No. 1:17-cv-2000, 2019 BL 120120, at *10 (M.D. Pa. Mar. 31, 2019) (citing *Slagle v. Cty. of Clarion*, 435 F.3d 262, 266 (3d Cir. 2006)).

15

76. Accordingly, Plaintiff's complaints of sexual harassment and gender discrimination constitute "protected activity" for purposes of her *prima facie* burden.

**B.    Plaintiff was Subjected to an Adverse Employment Action Contemporaneous with Her Protected Activity.**

77. Subsequent to Plaintiff's initial complaints to Mr. John of the sexual harassment and gender discrimination she was experiencing at the hands of Mr. Byrd, Mr. John appointed Mr. Byrd to act as Plaintiff's direct supervisor in his absence, thereby forcing Plaintiff to endure further sexual harassment and gender discrimination.

78. Within a short proximity of time after complaining about sexual harassment and gender discrimination to Mr. John and Mr. Ted, Plaintiff suffered the ultimate adverse employment action in that her employment relationship with Defendant was terminated.

**C.    A Causal Connection Between Plaintiff's Protected Activity and Defendant's Adverse Actions Readily Exists.**

79. A causal connection readily exists between Plaintiff's protected activity and the adverse employment actions described above.

80. The Third Circuit recognizes that a plaintiff can establish their protected activity was a "but-for cause of the alleged adverse action by the employer" by and through temporal proximity that is "unusually suggestive of retaliatory motive." *Hukman v. Am. Airlines, Inc.*, 796 F. App'x 135, 142-143 (3d Cir. 2019) (citing *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 570 U.S. 338m 362 (2013); *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017)).

81. Given the close temporal proximity that exists from, particularly the final time Plaintiff complained about sexual harassment and gender discrimination, to the time Defendant instituted adverse employment action by terminating her, it is necessarily inferable that Defendant retaliated against Plaintiff for the complaints of gender discrimination.

16

82. As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Kristy Babik, seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## REQUEST FOR RELIEF

Plaintiff, Kristy Babik, respectfully requests this Honorable Court to enter judgment in her favor, and against Defendant, and prays for relief as follows:

1. Declare and find that Defendant committed one or more of the following acts:

    i. Violated Title VII and/or the PHRA by discriminating against Plaintiff on the basis of her gender;

    ii. Violated Title VII and/or the PHRA by failing to correct a hostile work environment on the basis of her gender; and

    iii. Violated Title VII and/or the PHRA by retaliatorily terminating Plaintiff on the basis of her protected activity.

2. Award compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life;

3. Award equitable relief in form of back pay and front pay;

4. Award liquidated damages sufficient to deter Defendant from engaging in future conduct of a similar nature;

5. Award punitive damages sufficient to deter Defendant from engaging in future conduct of a similar nature;

6. Award attorney's fees; and/or

7. Award pre-judgment and continuing interest as calculated by the Court.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: December 5, 2023           By: */s/ Erik M. Yurkovich*
                                 Erik M. Yurkovich (Pa. I.D. No. 83432)

                                 The Workers' Rights Law Group, LLP
                                 Foster Plaza 10
                                 680 Andersen Drive, Suite 230
                                 Pittsburgh, PA 15220
                                 Telephone: 412.910.8057
                                 Fax: 412.910.7510
                                 erik@workersrightslawgroup.com

                                 *Counsel for Plaintiff, Kristy Babik*

**VERIFICATION**

I, Kristy Babik, have read the foregoing allegations in the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of my personal knowledge, information and/or belief. I understand that this verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Dated: 12 / 01 / 2023

_____
Kristy Babik